IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ADRIAN VLAD, *et al*., | ) | CASE NO. 1:19 CV 2024 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE WILLIAM |
| | ) | H. BAUGHMAN, JR. |
| DGI TRUCKING INC., | ) | |
| | ) | **REPORT AND RECOMMENDA-** |
| Defendant. | ) | **TION RE DELEGATION OF** |
| | ) | **ARBITRABILITY** |

**I.**

This case arises out of disputes over owner-operator motor vehicle lease agreements.  Carriers across the country—now more important than ever given pandemic lockdowns and growing ecommerce across industries—use these sorts of leases to offer delivery services to vendors without having to purchase trucks.  Instead, the carriers lease from independent truck drivers the use of their trucks along with their driving services.

The plaintiffs here are four independent truck drivers who operate their own trucks. They entered into lease agreements with DGI Trucking Inc. as a way to earn money for their trucking services.  DGI agreed to pay the four truck drivers a certain percentage of each completed shipment they drove.[1]

---

[1] ECF #8, at 3.  *See*, *e.g.*, ECF #1-1, at 1.

1

The four truck drivers sued DGI when disputes arose over payments.[2]  On November 4, 2019, DGI asked the District Court to stop the case from proceeding.[3]  DGI believes only an arbitrator is authorized to resolve disputes over the lease agreements and only through an arbitration process governed by rules published by the American Arbitration Association.  The truck drivers disagree.  They want the District Judge to resolve their claims or at least to decide whether their claims must be resolved by an arbitrator.[4]

No one disputes that the lease agreements contain arbitration clauses.  In the truck drivers' view, though, the arbitration clauses are both procedurally and substantively unconscionable and unconstitutional.  Much of their argument rests upon the fact that Romanian is their mother tongue, and they did not have an opportunity to negotiate the terms of the lease agreements or sufficiently review those terms before they signed.

The District Court granted in part DGI's motion.[5]  According to its ruling, a party must show both procedural and substantive unconscionability to challenge successfully an arbitration agreement (what gets arbitrated?) or a delegation clause (who decides what gets arbitrated?).[6]  The District Court held that the truck drivers failed to show that the delegation clause is substantively unconscionable.[7]  "However, given the serious questions whether the parties clearly and unmistakably agreed to delegate arbitrability questions to

---

[2] ECF #1.
[3] ECF #5.
[4] ECF #8.
[5] ECF #14.
[6] *Id*. at 12.
[7] *Id*.

the arbitrator in light of Plaintiffs' alleged English illiteracy and lack of understanding of the AAA Arbitration Rules, the Court finds Plaintiff's affidavits raise enough concerns that the issue will be referred to the Magistrate Judge for an evidentiary hearing and Report and Recommendation."[8]  After having conducted that evidentiary hearing to determine "whether the parties clearly and unmistakably agreed to have the arbitrator determine questions of arbitrability"[9] and after having reviewed the parties' post-hearing briefs[10] and evidence submitted in conjunction with that hearing,[11] I recommend that this question be answered in the affirmative.

## II.

**The Complaint and the Stay.**  The truck drivers suing DGI are Adrian Vlad, Lucian Solomon, Daniel Varvaruc, and Daniel Tarog.[12]  According to testimony, Messrs. Varvaruc, Tarog, and Solomon are brothers-in-law.[13]  All four men are owner-operators of their trucks, all are Romanian-born, and all entered into similar lease agreements with DGI.[14]  They allege that the lease agreements they signed violate federal regulations governing leases of this kind,[15] that DGI breached the lease agreements,[16] and that DGI

---

[8] *Id*. at 13.
[9] ECF #15.
[10] ECF #35 and #36.
[11] ECF #34.
[12] ECF #1, at 2.
[13] ECF #29, at 50, 145.
[14] ECF #8, at 2-3.  *See* Hrg. Exhs. F, G, H, I and 2, 3, 4, 5, 6.
[15] ECF #1, at 9-11.
[16] *Id*. at 11.

was unjustly enriched by underpaying the trucker drivers for their services.[17]

DGI sought a stay because, in its view, the lease agreements contain a mandatory, binding arbitration provision that requires arbitration of the truck drivers' claims through the AAA and pursuant to Ohio Rev. Code Ann. § 2711.02(B) (West).[18]  DGI's analysis rests on the arbitration clause and the delegation clause.  The distinction between each is important.

*The Arbitration Clause.*  The arbitration clause in all of the lease agreements is straightforward enough:

> Any controversy or claim arising out of this lease, or breach thereof, shall be settled by arbitration to be held in Cleveland, Ohio or other mutually acceptable location in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and a judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.[19]

This clause lays the foundation for any arbitration.  It is in effect a contract within a contract—an agreement to resolve lease disputes by arbitration.

*The Delegation Clause.*  If the arbitration clause sets the stage for possible resolution of the parties' disputes by arbitration, the delegation clause says who decides whether the arbitration clause is valid and whether the disputes at hand are in fact subject to arbitration.  The delegation clause here, though, is less obvious than the arbitration clause.  The arbitration clause quoted above doesn't mention anything about delegation, but it does specify that any arbitration shall be conducted "in accordance with the

---

[17] *Id*. at 12.
[18] ECF #5, at 1.
[19] *See*, *e.g.*, ECF #5-3, at 4.

4

Commercial Arbitration Rules of the American Arbitration Association." That's key, since those rules contain the delegation clause.

> R-7. Jurisdiction
>
> **(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.
>
> **(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.
>
> **(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.[20]

It makes sense then that the gateway issue the District Court must first decide is whether the parties agreed to delegate the determination of arbitrability to the arbitrator.[21] The District Court found that the delegation clause is not substantively unconscionable.[22] That finding, though, doesn't end the matter. The law creates an additional hurdle. "[T]he question of arbitrability . . . is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."[23]

---

[20] *See* https://www.adr.org/sites/default/files/Commercial%20Rules.pdf, last accessed on 10/9/20.
[21] ECF #14, at 4.
[22] *Id*. at 12.
[23] *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (citations omitted).

### III.

***Overview of Applicable Law.***  Before I analyze the evidence from the hearing, I will take a moment to lay out the legal guideposts for my analysis.  I do this given some complications lurking within arbitration law and given the interwoven nature of applicable state and federal law.  The Supreme Court has observed that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."[24]  In that sublime simplicity lies our legal complications.

In referring the narrow question of whether the parties clearly and unmistakably agreed to have the arbitrator determine questions of arbitrability, the District Court pointed to concerns about the truck drivers' alleged English illiteracy and their lack of understanding of the AAA arbitration rules.  The lease agreements provide that "[t]his lease shall be governed by Federal Law and regulations where applicable, and wherever there is no applicable Federal Law this lease shall be governed by the laws of the state of Ohio."[25]  Because the parties agree that the Federal Arbitration Act does not apply to the lease agreements,[26] much of my analysis of the evidence elicited at the hearing is under Ohio law.  Nevertheless, I must still keep an eye on federal law for reasons I explain below.

Ohio law is clear on a number of principles key to my analysis.  On the issue of arbitrability, Ohio law is in substance the same as federal law.  "[W]here the parties to a

---

[24] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted).
[25] *See*, *e.g.*, ECF #1-1, at 3.
[26] ECF #5-1, at 3; ECF #8, at 2, 8, n.8.

collective-bargaining agreement have clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability, the question of whether a matter is arbitrable is to be decided by the arbitrator."[27]  Like federal law, Ohio law distinguishes the agreement to arbitrate from the agreement to delegate the question of arbitrability to the arbitrator.  "[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter.  Did the parties agree to submit the arbitrability question itself to arbitration? If so, then the court' standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that the parties have agreed to arbitrate."[28]

As I noted above, this is not a case where the arbitration clause itself contains language delegating the question of arbitrability to the arbitrator like we find, for example, in collective bargaining agreements.[29]  Instead, the arbitration clause here incorporates by reference the AAA rules ("[a]ny controversy or claim arising out of this lease … shall be settled by arbitration … in accordance with the Commercial Arbitration Rules of the American Arbitration Association"), which in turn provide delegation language ("[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or

---

[27] *Belmont Cty. Sheriff v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 2004-Ohio-7106, 104 Ohio St. 3d 568, 820 N.E.2d 918 (2004).

[28] *Id.* at 570 (citing *AT & T Techs., Inc.*, 475 U.S. at 649).

[29] *See, e.g., id.* (Language from a collective bargaining agreement between the Fraternal Order of Police and Belmont County, Ohio provided, "The first question to be placed before the arbitrator will be whether or not the alleged grievance is arbitrable. If the arbitrator determines the grievance is within the purview of arbitrability, the alleged grievance will be heard on its merits before the same arbitrator.")

to the arbitrability of any claim or counterclaim").

Does this make a difference? No, according to law from both this State and this Circuit, so long as the parties have clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability.

Incorporating by reference a set of arbitration rules that contain language delegating the question of arbitrability to the arbitrator is not uncommon.[30]  Ohio law provides that incorporation by reference of industry-wide rules for arbitration that include delegation language is evidence that the parties clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability.[31]

The same is true under the law of our Circuit with a clear pronouncement on this point coming just this summer.  "What's more, district courts in our circuit have long found that the incorporation of the AAA Rules provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.' "[32]  By our Circuit's count, 11 out of 12

---

[30] *See*, *e.g.*, *von Arras v. Columbus Radiology Corp.*, 2005-Ohio-2562, 2005 WL 1220735 (2005) (incorporating by reference AAA rules); *Summit Constr. Co. v. L.L.F.J.A.O., L.L.C.*, 2012-Ohio-568, 2012 WL 473953 (2012) (incorporating the AAA's Construction Industry Arbitration Rules).

[31] *Summit Constr. Co.*, *id.*, at *4 (citing *Pappas v. Richmond Towers, L.L.C.*, 2011-Ohio-5249, 2011 WL 4836345, at *3 (2011) (quoting *Belmont Cty. Sheriff, supra,* 820 N.E.2d 918, at syllabus); *Cheney v. Sears, Roebuck & Co.*, 2005-Ohio-3283, 2005 WL 1515388, at *4 (2005) ("[t]he arbitrator, pursuant to the arbitration clause, has the authority to determine which of the claims are within the scope of the arbitration clause itself"); *Haddock v. Quinn*, 287 S.W.3d 158, 172 (Tex. App. 2009) ("[t]he majority of courts have concluded that express incorporation of rules empowering the arbitrator to determine arbitrability (including ruling upon his or her own jurisdiction) clearly and unmistakably evidences the parties' intent to delegate issues of arbitrability to the arbitrator")).

[32] *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 846 (6th Cir. 2020) (citations omitted), *cert. pet. pending sub nom. Piersing v. Domino's Pizza Franchising LLC*, Case

Circuits to have considered this question have found that incorporation of the AAA rules or similarly worded arbitral rules "provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.' . . .  And the one remaining circuit has precedent suggesting that it would join this consensus. . . .  Indeed, it's possible that our circuit has already joined too. . . .  But to the extent that there's any ambiguity in our prior decisions, we officially do so today."[33]

Under both federal and Ohio law then, the incorporation by reference of the AAA rules on arbitration satisfies the clear-and-unmistakable requirement.  In some instances, that may end the legal discussion of who gets to decide arbitrability.  But the question the District Court has referred to me requires that I push the legal analysis further.  One question remains: Does this case present an instance where, notwithstanding the parties' incorporation by reference of the AAA rules, there nevertheless was no meeting of the minds as to the delegation of arbitrability?  "A court must first resolve any challenge to the validity of an arbitration agreement before it may order compliance with the agreement. . . .  That is, any challenge to the validity of the arbitration agreement specifically—on 'such grounds as exist at law or in equity for revocation of any contract,' such as, for instance, that it is unconscionable or was induced by fraud—must be resolved by the court before ordering compliance with the arbitration agreement.[34]

---

No.  20-695  (https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles-/html/public/20-695.html) (last accessed on 12/1/20).

[33] *Id.* (citations omitted).

[34] *Milan Exp. Co. v. Applied Underwriters Captive Risk Assur. Co.*, 590 F. App'x 482, 485–86 (6th Cir. 2014) (citing and quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010), and citing *Fazio v. Lehman Bros.*, 340 F.3d 386, 393 (6th Cir. 2003)).

This question circles back to whether the parties agreed to arbitrate the question of arbitrability.  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts. . . .  The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration."[35]  The qualification is the one I've already discussed: I should not assume the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.[36]

With this hurdle cleared, one more legal guidepost remains.  "[A]bsent a showing of fraud, duress, mistake, or some other ground upon which a contract may be voided, a court must enforce a contractual agreement to arbitrate."[37]  Contracts, and therefore arbitration agreements, may be invalidated for reasons including forgery, lack of consideration, and unconscionability.[38] Since "ordinary state-law principles . . . govern the formation of contracts,"[39] I turn to Ohio law.

Ohio law considers a contract unconscionable "where one party has been misled as to its meaning, where a severe imbalance of bargaining power exists, or where the specific contractual clause is outrageous."[40]  More generally, unconscionability is the absence of

---

[35] *First Options of Chicago, Inc.*, 514 U.S. at 944 (citations omitted).
[36] *Id.* (citations omitted).
[37] *Haskins v. Prudential Ins. Co. of Am.*, 230 F.3d 231, 239 (6th Cir. 2000), *overruled on other grounds by Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) (en banc).
[38] *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).
[39] *First Options of Chicago, Inc.*, 514 U.S. at 944.
[40] *Cross v. Carnes*, 132 Ohio App. 3d 157, 724 N.E.2d 828, 837 (1998).

meaningful choice for one party and the presence of unreasonably favorable contract terms for the other.[41]  Therefore, a court will find unconscionability upon the satisfaction of two criteria: (1) "substantive unconscionability," or unfair and unreasonable contract terms; and (2) "procedural unconscionability," or individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible.[42]  As the evidentiary hearing focused on the truck drivers' alleged English illiteracy and lack of understanding,[43] I need only concern myself with the latter.

Procedural unconscionability may be identified by the " 'knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of . . . illiteracy or inability to understand the language of the agreement.' "[44]  While illiteracy can provide a basis, it is not conclusive.[45]  "The crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print. . . ?' "[46]

---

[41] *Collins v. Click Camera & Video, Inc.*, 86 Ohio App. 3d 826, 621 N.E.2d 1294, 1299 (1993).

[42] *See Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 365 (6th Cir. 2014) (citing *Collins*, 621 N.E.2d at 1299).

[43]  ECF #14, at 12-13.

[44] *Eastham*, 754 F.3d at 365 (quoting *Taylor Bldg. Corp. of Am. v. Benfield*, 2008-Ohio-938, 117 Ohio St. 3d 352, 884 N.E.2d 12, 22–23 (2008) (citations, quotation marks, and alterations omitted)).

[45] *Eastham*, 754 F.3d at 366.

[46] *Ohio Univ. Bd. of Trustees v. Smith*, 132 Ohio App. 3d 211, 724 N.E.2d 1155, 1161 (1999) (quoting *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376, 613 N.E.2d 183, 189 (1993) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965))) (internal quotation marks omitted).

In determining whether the truck drivers had a reasonable opportunity to understand the lease agreements, I consider such factors as whether DGI provided the contract in clear and plain English,[47] whether DGI allowed the truck drivers the opportunity to consult an attorney,[48] and whether DGI refrained from pressuring the contracting party to sign before thorough review.[49]

The truck drivers in turn are responsible for reading and taking those steps necessary to understand the contract before signing.[50]  "The law does not require that each aspect of a contract be explained orally to a party prior to signing."[51]  Moreover, the law does not excuse the failure on the part of a signatory to read the contract before signing.  "A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed."[52]  "The legal and common-sensical axiom that one must read what one

---

[47] *Ohio Univ. Bd. of Trustees*, 724 N.E.2d at 1161.

[48] *Taylor Bldg. Corp. of Am.*, 884 N.E.2d at 23; *Broughsville v. OHECC, LLC*, 2005-Ohio-6733, 2005 WL 3483777, at  *5 (2005) ("[w]hile having an attorney present is a factor to be considered, it is in no way dispositive of the issue").

[49] *John R. Davis Tr. 8/12/05 v. Beggs*, 2008-Ohio-6311, 2008 WL 5104808, at *7 (2008).

[50] *Moran v. Riverfront Diversified, Inc.*, 2011-Ohio-6328, 197 Ohio App. 3d 471, 968 N.E.2d 1, 7 (2011).

[51] *ABM Farms, Inc. v. Woods*, 1998-Ohio-612, 81 Ohio St. 3d 498, 503, 692 N.E.2d 574 (1998).  *See also English v. Cornwell Quality Tools Co.*, 2005-Ohio-6983, 2005 WL 3556281 at *5 (2005) (finding company not remiss when it failed to suggest that each appellant read the contract carefully or retain counsel).

[52] *McAdams v. McAdams*, 80 Ohio St. 232, 240–241, 88 N.E. 542, 544 (1909) (quoted in *ABM Farms, Inc.*, 81 Ohio St. 3d at 503.)

signs"[53] and long-standing principles like it are, of course, found not just in Ohio law.[54]  In the end, I must look to the totality of the circumstances, not any specific factor or number of factors, to determine procedural unconscionability.[55]

There is good reason for this rather meandering road to resolution.

> [T]he . . . question—the "who (primarily) should decide arbitrability" question—is rather arcane.  A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. . . .  And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.[56]

---

[53] *ABM Farms, Inc.*, 81 Ohio St. 3d at 503.  *See also Ball v. Ohio State Home Servs., Inc.*, 2006-Ohio-4464, 168 Ohio App. 3d 622, 861 N.E.2d 553, 557 (2006) (finding that plaintiffs "could have had an attorney review the contract prior to signing but chose not to because they did not feel one was necessary," and even assuming plaintiffs had failed to understand the contract, they were sophisticated enough to appreciate the possibility of retaining counsel and nothing prevented them from doing so).

[54] *See*, *e.g.*, *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.").  *See also Blanton*, 962 F.3d at 847–52 (addressing numerous contract law principles that run contrary to plaintiff's arguments against holding that incorporation of AAA rules provides clear and unmistakable evidence of an agreement to arbitrate arbitrability); *Haskins*, 230 F.3d at 239 (rejecting certain standards for enforcing a contractual agreement to arbitrate because to do so would force the Court to "ignore long-standing rules of contract law," including that " 'ignorance of the contents of a contract expressed in a written instrument does not ordinarily affect the liability of one who signs it' ") (quoting 17A Am. Jur. 2d Contract § 224 (1991)).

[55] *See Murea v. Pulte Grp., Inc.*, 2014-Ohio-398, 2014 WL 504848, at *2 (2014) (citing *Hayes v. Oakridge Home*, 122 Ohio St. 3d 63, 2009-Ohio-2054, 908 N.E.2d 408, 413-14 (2009)).

[56] *First Options of Chicago, Inc.*, 514 U.S. at 945 (citations omitted).

This language provides a helpful backdrop to the parties' recent evidentiary hearing. So, what did their evidence show?

## IV.

***Evidence from the Hearing.***  I conducted the hearing via Zoom videoconferencing on July 20, 2020.  All four plaintiffs testified.[57]  Juan Chahda, the president of Cleveland Die Manufacturing Company and a former work colleague of Daniel Tarog, and Alina Sacu, the spouse of DGI's owner, testified on behalf of DGI.[58]

Testimony showed that DGI presented the entirety of the lease agreements in standard print, not fine print where it might have been difficult for the truck drivers to read the terms of the lease agreements.[59]  The lease agreements typically required only one signature by each of the truck drivers at the bottom of the agreement and then a second signature to acknowledge that DGI's receipt of the leased vehicle.  The arbitration clauses (and therefore the delegation clauses) did not require a separate signature directly below the terms.

No one from DGI read to any of the truck drivers in either English or Romanian the arbitration clause or apparently any other clause of the lease agreements.[60]  No one from DGI provided a Romanian translation of the lease agreements.[61]  But no one ever asked for

---

[57] ECF # 29, at 9-47 (Vlad); at 47-78 (Varvaruc); at 78-104 (Solomon); at 104-125 (Tarog).
[58] *Id.* at 128–132 (Chahda); at 133-168 (Sacu).
[59] ECF #5-3 to ECF #5-8.
[60] ECF #29, at 14, 16, 21, 54, 57, 71, 83-84, 86, 109.
[61] *Id.* at 20, 101.

any explanation or translation either.[62]

The arbitration clause is in plain English, and is not particularly lengthy or complex. Moreover, the truck drivers had an opportunity to consult an attorney or anyone else before signing, and an opportunity to consider the terms of the contract before signing.  DGI did not pressure the truck drivers to sign before they could review the lease agreements, and DGI owners and employees made themselves available to answer any questions the truck drivers might have had.[63]  Testimony from both sides' witnesses showed that the truck drivers were motivated to enter into their business arrangements with DGI by their friendships with other DGI drivers or with Alina and Daniel Sacu, who owns DGI,[64] the close-knit nature of the Romanian community in the Northeast Ohio area, and their shared mother tongue.[65]  DGI's owner, his spouse, and the truck drivers all grew up speaking Romanian.

There was no testimony to suggest DGI pressured the truck drivers into signing the lease agreements, or somehow prevented them from consulting with anyone else before signing—including DGI's owner or employees or attorneys of their choosing—if they had wanted to do so.[66]  There was no testimony to suggest any of the truck drivers wanted to do so.

Furthermore, nothing in the evidence suggested, let alone established, that DGI

---

[62] *Id.* at 71, 88, 100, 121-22, 137, 138, 140-41, 143-48.
[63] *Id.* at 136, 138, 140-41, 143-46, 148.
[64] *Id.* at 167.
[65] *Id.* at 12, 50–51, 55–56.
[66] *Id.* at 18, 38–40, 54, 86, 108.

prevented the truck drivers from negotiating other terms, including the arbitrability of their disputes.  The evidence suggested that the truck drivers could have leased their trucking services to another carrier if they were dissatisfied with DGI's terms.  They instead chose DGI because of their friendships with the owner or other employees or because of references to DGI from friends in the Romanian community, as noted above.[67]

My analysis does not end with these findings.  Although the truck drivers could have consulted with an attorney or others before signing the lease agreements, they claim they are unsophisticated and the victims of disparate bargaining power.  They also claim their level of English proficiency was insufficient to understand all the terms of the lease agreements, including the arbitration clause and the delegation clause.[68]

For example, Vlad testified he could not read English[69] but could "speak basic stuff."[70]  Varvaruc testified he had "a basic understanding of English,"[71] and could read "basic stuff" in English.[72]  Solomon testified he could speak and read "[b]asic stuff" in English,[73] and acknowledged that he understood "the basics" of the lease agreements.[74]  Tarog testified he could speak "[a] little bit" which he later defined as "60 percent,"[75] and

---

[67] *Id.* at 12–14, 18, 82, 106.
[68] *See* Hrg. Exhs. A, B, C, D.
[69] ECF #29, at 11.
[70] *Id.*
[71] *Id.* at 47.
[72] *Id.* at 48, 76.
[73] *Id.* at 79, 83.
[74] *Id.* at 89.
[75] *Id.* at 116.

knew "enough just to make me comfortable"[76] or "basic English."[77]  These grounds could weigh in favor of finding procedural unconscionability in considering the totality of the circumstances.[78]

The evidence demonstrated that the truck drivers are not as unsophisticated or illiterate in English as they claim.  Three completed high school in Romania (Vlad, Solomon, and Tarog[79]); one completed a three-year professional school in Romania (Varvaruc[80]); and two completed undergraduate studies in Romania (Solomon and Tarog[81]).  Each driver was sophisticated enough to form his own limited liability company to protect himself and his savings against personal liability.[82]  And while they consulted with their wives or friends in forming these companies,[83] that doesn't mean they are any less sophisticated.  It in fact suggests the opposite.

---

[76] *Id.* at 118.

[77] *Id.* at 121.

[78]  *See*, *e.g.*, *Caldwell v. KFC Corp.*, 958 F. Supp. 962, 974–75 (D.N.J. 1997)  (contract containing arbitration clause was deemed unconscionable and adhesive where a parolee with an 11th-grade education was in dire need of employment and was forced to sign).  *But see W.K. v. Farrell*, 2006-Ohio-2676, 167 Ohio App. 3d 14, 853 N.E.2d 728, 738 (2006) (merely having "less bargaining power" than the employer doesn't mean the employee was "essentially forced" to accept employment and sign the arbitration agreement); *Love v. Crestmont Cadillac*, 2017-Ohio-1555, 90 N.E.3d 123, 129 (2017) (a woman with two master's degrees led to believe she had no ability to negotiate any of the preprinted terms in an arbitration contract failed to sustain her burden of demonstrating that the arbitration agreement was procedurally unconscionable where there was no evidence she ever attempted to negotiate or alter any terms of the agreement).

[79] Hrg. Exhs. A, ¶ 2; B, at ¶ 3; D, at ¶ 3.

[80] Hrg. Exh. C, at ¶ 3.

[81] Hrg. Exh. B, at ¶ 3; D, at ¶ 3.

[82] ECF #29, at 33-34, 67, 96, 118.  *See* Hrg. Exhs. 10, 11, 12, 13.

[83] *Id.* at 34, 67, 96, 118.

When a situation arose where they didn't understand some legal terminology, the truck drivers acknowledged the need to consult with someone whose English proficiency was better than theirs.  In addition to the times when they formed their own companies, they sought out assistance from their wives or friends when completing a police report after a traffic accident;[84] when purchasing a home with a mortgage;[85] when posting on Facebook;[86] and when dealing with cellphone companies, bills, contracts, and subscriptions.[87] Each of the truck drivers also passed the examinations necessary to obtain a commercial driver's license, which the state administers only in English, albeit after some unsuccessful attempts by some of them.[88]

Juan Chadha, the president of Cleveland Die Manufacturing Company, testified that Tarog led a department at Cleveland Die, where he worked for eight years before working as a truck driver for DGI.[89] Tarog testified that he had supervised individuals with a wide range of nationalities and languages, and that he did not believe the common language spoken at Cleveland Die was English.[90]  Chadha testified that English was indeed the common working language at Cleveland Die, and that Tarog was able to accomplish all of his duties as supervisor and lead man while speaking English.[91]  Neither Chadha nor

---

[84] *Id.* at 17, 35–36.  *See* Hrg. Exh. 9.
[85] *Id.* at 19, 34, 60–61, 68, 90, 97–98, 119.  *See* Hrg. Exh. 14, 15, 16, 17.
[86] *Id.* at 74.  *See* Hrg. Exh. 8.
[87] *Id.* at 74.
[88] *Id.* at 25–27, 63–64, 85, 94, 107, 114, 116–17.
[89] *Id.* at 129–30.
[90] *Id.* at 124.
[91] *Id.* at 131.

Tarog's immediate supervisor knows Romanian,[92] and neither had any issues with Tarog's English proficiency.[93]

Alina Sacu provided similar testimony with regard to Vlad, who had previously worked as a house man at the Intercontinental Hotel in downtown Cleveland for ten years.[94] Sacu had worked at the same hotel but in a different department for two of those ten years.[95] She testified that Vlad needed to speak English during his job when communicating with his supervisors, others in upper management, and hotel guests.[96]  Vlad denied having had contact directly with hotel clients, and testified that the hotel had a lot of Romanians on staff.[97]  Sacu also testified that all DGI drivers needed to use English in their work when speaking with third-party brokers regarding shipments to be made,[98] with shipment receivers,[99] with governmental transportation inspectors and agents,[100] with DGI's dispatcher and safety managers who did not know Romanian,[101] and when completing paperwork related to their job.[102]

That the AAA rules were not made available to the truck drivers before they signed the lease agreements[103] does not mean they were prevented from asking DGI for a copy of

---

[92] *Id.* at 130–31.
[93] *Id.* at 130.
[94] *Id.* at 44.
[95] *Id.* at 44, 139, 163.
[96] *Id.* at 139.
[97] *Id.* at 45.
[98] *Id.* at 150.
[99] *Id.* at 151.
[100] *Id.*
[101] *Id.* at 152.
[102] *Id.* at 153–54.
[103] *Id.* at 21, 55, 109.

them or finding them on their own.  Evidence showed that the truck drivers at least periodically use the internet and social media, including Google Mail and Maps,[104] Facebook,[105] and YouTube.[106]  The evidence also showed that at least one of the drivers (Varvaruc) used Google Translate to create a Facebook post.[107]  With their knowledge of these tools, nothing prevented them from finding the AAA rules on the internet in about five to ten seconds using the basic search terms "arbitration rules aaa" or a similar word combination,[108] and translating them if needed for free.[109]

According to their testimony, the truck drivers did not read the entire contract before signing, but instead trusted Alina and Daniel Sacu to provide fair terms.[110]  Some suggested they couldn't understand all the terms.  Perhaps so, but this testimony merely brings us back to my earlier finding: nothing prevented the truck drivers from seeking assistance in understanding the agreements.[111]  As I noted above, at other times when they needed help navigating legal documents like mortgages, the truck drivers sought out help from their wives or from friends at a mortgage company[112] or from real estate agents,[113] including

---

[104] *Id.* at 16, 87.

[105] *Id.* at 72.  *See also* ECF #11-6.

[106] *Id.* at 85.

[107] *Id.* at 72.

[108] *See* https://adr.org/rules, last accessed on 8/7/20.

[109] *See*, *e.g.*, https://translate.google.com/, last accessed on 12/2/20.

[110] ECF #29, at 18, 37-38, 51, 70-72, 83, 100-01, 122.

[111] *See*, *e.g.*, *Ball*, 861 N.E.2d at 557 (contracting party is " 'presumed to know the reasonable import of the contents of a signed agreement, including the existence and scope of an arbitration clause' ") (quoting *Garcia v. Wayne Homes, L.L.C.*, 2002-Ohio-1884, 2002 WL 628619, at *11 (2002)).

[112] ECF #29, at 111.

[113] *Id.* at 19.

ones who spoke Romanian.[114]  No one explained why this time should have been any different—unless, of course, the truck drivers did in fact understand the terms of the lease agreements or, if not, chose not to take the time to understand them.  The law is clear on this point.  Relying on trusted friends to offer fair terms does not excuse the signatory from his obligation to read all the terms before signing.[115]

## V.

The touchstone of the formation of any contract, including an arbitration clause and a delegation clause, is a meeting of the minds.  The evidence demonstrates that a meeting of the minds occurred for both clauses.  In fact, to read the evidence any differently would require me to overturn well-established state contract law—something our Circuit itself avoided earlier this summer by holding that incorporation by reference of the AAA rules satisfies the the clear-and-unmistakable requirement for arbitrability.

The evidence also demonstrates the absence of any procedural unconscionability.  The truck drivers had multiple reasonable opportunities to understand the terms of their lease agreements with DGI, including the arbitration clause and the delegation clause.  They were responsible for reading and taking those steps necessary to understand the lease agreements before signing.  Deficits in English language proficiency may have required additional steps to acquire that understanding.  The truck drivers knew what those

---

[114] *Id.* at 90.
[115] *See*, *e.g.*, *John R. Davis Tr. 8/12/05, supra*, 2008 WL 5104808, at *6 (although signatories may have trusted one another and even had a fiduciary duty towards one another, that did not discharge each signatory's duty to review the provisions of the operating agreement and negotiate any provisions they considered unacceptable).

additional steps entail from prior occasions when they dealt with legal documents. They instead chose to sign the lease agreements without completely reading them, without making inquiries, and without taking any steps to understand the contract terms.

Accordingly, I recommend a finding that the parties clearly and unmistakably agreed to have the arbitrator determine questions of arbitrability; and that no procedural unconscionability existed to negate the parties' meeting of the minds.


Dated: December 3, 2020            s/ William H. Baughman, Jr.
                                   United States Magistrate Judge

**Objections**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of service of this notice.  Failure to file timely objections within the specified time shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.[*]

---

[*] *See* Local Rule 72.3; *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).