UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ADRIAN VLAD, ET AL., | ) | CASE NO.1:19CV2024 |
| | ) | |
| Plaintiffs, | ) | SENIOR JUDGE |
| | ) | CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| DGI TRUCKING, INC., | ) | OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, SR. J:**

  This matter is before the Court on the Motion to Stay Pending Arbitration (ECF # 5) by Defendant DGI Trucking, Inc. The Court found the parties' arbitration clauses were not substantively unconscionable due to arbitration costs but held that there were issues of fact regarding whether the parties agreed to delegate to the arbitrator questions of arbitrability. The Court then referred the issue to the Magistrate Judge to hold an evidentiary hearing and issue a Report and Recommendation. The Magistrate Judge has completed the hearing and has issued his Report, recommending the Court find that the parties agreed to delegate questions of arbitrability to the arbitrator. Plaintiffs have objected to the Magistrate Judge's recommendation. For the following reasons, the Court adopts the Magistrate Judge's Report and Recommendation, finds the parties agreed to delegate issues of arbitrability for the arbitrator, and stays the case to allow the parties to arbitrate their disputes.

**Factual Background**

According to Plaintiffs' Complaint, Plaintiffs Adrian Vlad ("Vlad") Lucian Solomon ("Solomon"), Daniel Varvaruc ("Varvaruc") and Daniel Tarog ("Tarog") are owner-operator, independent truck drivers who entered into Lease Agreements with Defendant DGI Trucking, Inc. ("DGI"), an authorized carrier. Under federal regulations, authorized carriers like DGI may transport interstate using equipment it does not own so long as the equipment is covered by a written lease that conforms to the requirements of 49 CFR § 376.

Plaintiffs entered into multiple Lease Agreements with DGI. According to Plaintiffs, DGI failed to include several provisions in the Lease Agreements required under law. Plaintiffs further contend DGI breached these Lease Agreements, causing injury to Plaintiffs.

Defendant moved to stay the action to allow the parties the opportunity to arbitrate their disputes per arbitration clauses in their Lease Agreements. Plaintiffs opposed the motion, contending that the arbitration agreements were substantively unconscionable and that the parties never clearly and unmistakably agreed to delegate questions of arbitrability to the arbitrator.

In its ruling, in part on the Motion, the Court determined Plaintiffs had failed to offer sufficient evidence to show that the arbitration clause was substantively unconscionable due to the costs of arbitration. However, the Court determined there were issues of fact concerning whether the Plaintiffs understood they were delegating questions of arbitrability to an arbitrator based on their alleged limited understanding of English and AAA Commercial Arbitration rules.

**Magistrate Judge's Report and Recommendation**

The Magistrate Judge conducted an evidentiary hearing and recommends that the Court find the parties clearly and unmistakably agreed to delegate questions of arbitrability to the arbitrator. In reaching this conclusion, the Magistrate Judge first considered the language of the

arbitration clauses found in each Plaintiff's Lease Agreement. Each of the Plainiff's arbitration clauses are identical and read as follows:

> Any controversy or claim arising out of this lease, or the breach thereof, shall be settled by arbitration to be held in Cleveland, Ohio or other mutually acceptable location in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and a judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

In addition, Section 5(B) of the Lease Agreements reads, "[t]his lease shall be governed by Federal Law and regulations where applicable, and wherever there is not applicable Federal Law this lease shall be governed by the laws of the state of Ohio."

The Magistrate Judge noted that no one disputes the Lease Agreements contain arbitration clauses. Rather, Plaintiffs dispute the enforceability of the same due to their limited English language comprehension, inability to negotiate the terms of the lease agreements and lack of sufficient time to review the terms of the Lease Agreements before signing.

The Magistrate Judge and parties all agree that Ohio substantive law on contracts governs disputes over whether the parties agreed to delegate arbitrability issues to an arbitrator.

The Magistrate Judge considered the arbitration clause and found that it contains no express language delegating issues of arbitrability to the arbitrator. However, it does expressly state that the arbitration will be governed by the Commercial Arbitration Rules of the American Arbitration Association. Rule 7 of the AAA Commercial Arbitration Rules reads:

> R-7. Jurisdiction-
>
> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

3

> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.
>
> (c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

Thus, the Rules themselves expressly reserve the authority to determine issues of arbitrability for the arbitrator. Moreover, the Magistrate Judge determined that " Ohio law provides that incorporation by reference of industry-wide rules for arbitration that include delegation language is evidence that the parties clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability." (R & R pg. 8. ). The Magistrate Judge noted that eleven out of twelve Circuit Courts agree that incorporation of arbitration rules clearly an unmistakably demonstrate agreement of the parties to delegate.

The Magistrate Judge then considered the evidence produced at the hearing before him.[1] All four Plaintiffs testified at the hearing as did a representative of Defendant. The testimony revealed that the Lease Agreements were drafted in standard size print and each required a signature on the last page. No Romanian translation was provided nor was any requested by Plaintiffs. The arbitration clause is written in plain English. Defendant did not pressure Plaintiffs to sign the Lease Agreements before they had a chance to review them and Defendant made its representatives available to Plaintiffs to discuss any questions they had prior to signing. Defendant did not prevent Plaintiffs from consulting anyone on the Lease Agreements prior to

---

[1] In light of the Covid pandemic, the Magistrate Judge conducted the evidentiary hearing via the Zoom teleconferencing application.

signing and no Plaintiff indicated a desire to consult with an attorney prior to signing.

Each Plaintiff testified to a lack of fluency in English but acknowledged they understood basic English and further understood the basics of the Lease Agreements. However, the Magistrate Judge found that the evidence supported Defendant's argument that the four Plaintiffs have a greater understanding of English than their testimony would indicate. Three completed high school in Romania and one completed a three year professional school in Romania. Two went on to complete undergraduate studies in Romania. Perhaps most tellingly, all four Plaintiffs formed their own limited liability companies to protect themselves and their assets. All testified that when they did not understand a particular legal term they consulted with someone whose English was superior to their own. Each passed the English language Commercial Driver's License exam.

Further evidence showed the drivers all used the internet, including social media, Google Maps and Mail, Youtube and Facebook. At least one of the Plaintiffs also used Google translate. Thus, each Plaintiff possessed the knowledge and ability to look up the AAA arbitration rules and translate any terms they did not understand.

All four Plaintiffs did not read the entire Lease Agreement before signing but instead, relied on Defendant's owners Alina and Daniel Sacu to give them fair terms. The Magistrate Judge found the parties had the opportunity to negotiate the terms; in fact, they could have leased their services to another trucking company but chose to sign with Defendant because of the relationship they had with Defendant's owners, including their shared Romanian heritage.

Because the evidence in the case demonstrates Plaintiffs had the opportunity to negotiate the terms of the Lease Agreement, possessed proficiency in English sufficient to understand

5

what they were signing, chose not to read the entire Lease Agreement, were not pressured to sign the Lease Agreements and could have consulted with an attorney before signing, the Magistrate Judge found no procedural unconscionability. The Magistrate Judge recommends the Court find that there was a meeting of the minds that the parties agreed to delegate questions of arbitrability to an arbitrator and therefore, the Court should enforce the arbitration clause.

**Objections**

Plaintiffs object to the Magistrate Judge's Report and Recommendation, contending that the Magistrate Judge gave undue weight to the testimony of Defendant's witnesses while undervaluing or discounting the testimony of Plaintiffs.

The Magistrate Judge discussed how Plaintiffs had previously sought out and consulted with friends, spouses or other associates when they needed to understand legal terminology, for example, when hey formed their own limited liability companies. Plaintiffs assert these are distinguishable from the Lease Agreements because Plaintiffs did not have the opportunity to consult with others prior to signing the Lease Agreements. Instead, Plaintiffs argue the testimony at the hearing revealed that Plaintiffs were presented with the Lease Agreements in a take-it-or-leave it fashion. For example, Varvaruc testified that he was given the second Lease Agreement moments before he was to set out on his assignment for the day and told to sign it before heading out. Plaintiffs further contend that Defendant's testifying representative Alina Sacu was only present for two of the Lease Agreement signings and therefore, lacked any personal knowledge on the other signings.

According to Plaintiffs, the record from the evidentiary hearing clearly shows that the AAA Commercial Rules of Arbitration were never provided to Plaintiffs nor mentioned by

Defendant before Plaintiffs signed the Lease Agreements. Nor does the record reflect that any attempts were made by Defendant to explain the meaning of arbitration itself, let alone that issues of arbitrability would be delegated to an arbitrator.

Even assuming Plaintiffs had the opportunity to review the Lease Agreements before signing, Plaintiffs argue that the testimony at the evidentiary hearing clearly demonstrated they could not have understood it given their limited English language skills. All four Plaintiffs were born and raised in Romania. None spoke English growing up nor did they receive any English language instruction while in high school or college. Each Plaintiff testified they speak Romanian in their daily lives, including at home and work, and they primarily spoke Romanian while working at DGI since DGI principal owners are Romanian.

## LAW AND ANALYSIS

### Standard of Review

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1)(c), the District Court shall review *de novo* any finding or recommendation of the Magistrate's Report and Recommendation to which specific objection is made. A party who fails to file an objection waives the right to appeal. *U.S. v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). In *Thomas v. Arn*, 474 U.S. 140, 150 (1985), the Supreme Court held: "[i]t does not appear that Congress intended to require district court review of a magistrate judge's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."

Local Rule 72.3(b) recites in pertinent part:

> The District Judge to whom the case was assigned shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate

Judge.

Put another way, 28 U.S.C. § 636(b) and Local Rule 72.3 authorize the District Court Judge to address objections by conducting a *de novo* review of relevant evidence in the record before the Magistrate Judge. Parties are not permitted at the district court stage to raise new arguments or issues that were not presented to the magistrate. *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000), citing *United States v. Waters*, 158 F.3d 933 (6th Cir. 1998).

**Magistrate Judge's Factual Determinations**

The Court reviews de novo the factual findings of the Magistrate Judge, however, that review must take into consideration that the Magistrate Judge was in the best position to make credibility assessments as he was present during the testimony. When reviewing the Magistrate Judge's credibility determinations the Court should consider the Magistrate Judge "had the opportunity to view [each] witness on the stand and assess [the witness's] demeanor," *Peveler v. United States,* 269 F.3d 693, 702 (6th Cir. 2001), "and therefore the Magistrate Judge was 'in the better position to assess the credibility of witnesses' he heard during the evidentiary hearing." *United States v. Woodruff,* 830 F. Supp. 2d 390, 402 (W.D. Tenn. 2011) quoting *United States v. Robinson*, No. 1:07–CR–1, 2007 WL 2138635, at *1 (E.D. Tenn. July 23, 2007)). "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his de novo review of the record he finds a reason to question the magistrate judge's assessment." *United States v. Johnson,* No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011). See also *Blankenburg v. Warden, Belmont Corr. Inst.,* No. 1:16-CV-505, 2019 WL 4751801, at *3 (S.D. Ohio Sept. 29, 2019), aff'd sub nom. *Blankenburg v. Gray,* No. 19-3998, 2020 WL 6111200 (6th Cir. Sept. 17, 2020).

We start first with the principle in Ohio law that when a party to a contract signs it the law assumes the signatory read the agreement. "Based on Ohio case law, simply signing the arbitration agreement assumes that the signer read and understood the arbitration agreement and the other party should be able to rely on that." *Dacres v. Setjo, L.L.C.,* 2019-Ohio-2914, ¶ 17, 140 N.E.3d 1041, 1046. Plaintiffs first objection is that there is no evidence that Plaintiffs were given a legitimate opportunity to review the Lease Agreements. In support, Plaintiffs cite to their testimony at the hearing. Vlad testified:

> Q. Okay. When you were given the contract to sign, were you told to sign it right away?
>
> A. I'm sorry. Can you translate, please ? (Interpreting.)
>
> THE INTERPRETER: The contracts from DGI ? The contracts from DGI ? He's asking me. Sorry.
>
> Q. Did Alina want you to sign the contract when she gave it to you? (Interpreting.)
>
> THE INTERPRETER :Yes, she asked me to go to the office, gave me the contract, asked me to sign it and then she give me a copy.

(Transcript of hearing pg 18).

Daniel Varvurec testified:

> A. That's the only thing what we talk about percent, how much they going to take from the gross, and that's it. You take 80, I take 20. That was it. This is the contract. Here you have to sign. Go over the pages, you'll have to sign here I sign here. He wasn't– if I remember, he was already sign it for me. He didn't tell me what in the contract.

(Transcript pg. 54).

Later, Varvaruc testified:

> A. When they call, ask us to sign this contract, the new contract, I was on the road. They said everybody had to come to the office to sign the contract. And when I step into the office, it was a contract, stack of contract like this. And it was a dispatch over there, Josh was his name. He said then you have to sign over here and if he was already sign it, the owner doesn't work over there. It was only the dispatch.

(Transcript pg. 56)

> On cross examination Varvaruc explained:
>
> Q. Okay. And did you read this agreement? Did you read this contract?
>
> A. No, no, because I was in the room when they called me, you had to sign the new contract and--I believe I was under dispatch and I have to hurry up. You don't have the page, you have to sign it here. He was already signing by Daniel--not Daniel, this signature I don't know it's Daniel Sacu. I don't know.
>
> Q. Just so I'm clear, you were on the road when you signed it. You signed it on a desk in an office, right?
>
> A. I was on the dispatch, and they call me to come to the office, and I came with my truck over there, and I sign it and go back in my truck and hit the road.

(Transcript pg 70).

Plaintiffs assert the above testimony evidences the "high-pressured" and "take-it-or-leave-it" nature of the Lease Agreement signings. Moreover, all Plaintiffs testified that the arbitration agreement and the consequences of agreeing to the AAA Commercial Rules of Arbitration were not explained to them. In fact, Alina Sacu, DGI's testifying representative, was not present for all but two of the Lease Agreement signings. Therefore, according to Plaintiffs,

she lacks personal knowledge of the circumstances under which Plaintiffs were required to sign the Lease Agreements.

But the Magistrate Judge determined that there was no high pressure tactics employed by Defendant. Vlad testified Alina asked him to sign it immediately but there was no testimony that they could not have taken it home or had an attorney look at first before signing it. There were no threats, implicit or explicit that a failure to sign immediately would result in some negative consequence.

Solomon testified that when Alina called him to come to the office and sign the Lease Agreement she told him to sign it when he could. (Transcript pg. 86). Plaintiffs all signed the Lease Agreements largely because they trusted Alina and Daniel due in part to the fact they were also Romanian. Furthermore, the Magistrate Judge determined that none of the Plaintiffs indicated a desire to take the Lease Agreement home or have an attorney review it before signing.

Ohio courts have enforced arbitration clauses when there is no evidence that the party challenging the enforcement of the same "were hurried through [the] signature process" or when "the circumstances do not show that they were prevented from consulting with an attorney if they wished." *Taylor Bldg. Corp. of Am. v. Benfield,* 2008-Ohio-938, ¶ 46, 117 Ohio St. 3d 352, 362, 884 N.E.2d 12, 23

The Lease Agreements themselves are not lengthy documents as they consist of only three or four pages in total and the arbitration clause is written in the same font as the rest of the Lease Agreement. The Magistrate Judge correctly determined that Ohio law does not require the drafting party explain every term of the contract to the other. See *Moran v. Riverfront*

*Diversified, Inc.,* 2011-Ohio-6328, ¶ 25, 197 Ohio App. 3d 471, 479–80, 968 N.E.2d 1, 7–8, "[t]he law does not require that each aspect of a contract be explained orally to a party prior to signing." See also *Garcia v. Wayne Homes, L.L.C.* (Apr. 19, 2002), Clark App. No. 2001 CA 53, 2002 WL 628619, *8 ( noting, "there is no requirement that an arbitration clause be explained orally to a party prior to signing where the provisions at issue were not in fine print, were neither hidden nor out of the ordinary, and were not misrepresented to the signatory").

Moreover, as the Magistrate Judge also found, Vlad, Varvaruc, Solomon and Tarog all testified they did not even read the Lease Agreement before signing it as they trusted Alina and Daniel. (Transcript pg. 37-38, 70-72, 100-101 and 122.). "'If a person can read and is not prevented from reading what he signs, he alone is responsible for reading what he signs.'" *Moran,* 197 Ohio App. 3d at 479–80 quoting *Hawkins v. O'Brien,* Montgomery App. No. 22490, 2009-Ohio-60, 2009 WL 50616, ¶ 23.

Alina Sacu, who along with her husband Daniel owns DGI, testified that each Plaintiff had the opportunity to read the Lease Agreement and were encouraged to ask any questions they had about it, but all four failed to ask any questions, but signed without questioning or asking to have an attorney review it. Even if Alina were not present for the signing of all four Plainitffs' Lease Agreements, none of the Plaintiffs testified that they had to sign immediately or face negative consequences. Thus, the Court agrees with the Magistrate Judge that none of the Plaintiffs were pressured into signing the Lease Agreements before reading, none were told they could not take it home and none were told they could not consult an attorney. Plaintiffs did not read the Lease Agreements before signing, did not ask to have the terms explained, and did not ask to take it home or consult with an attorney before signing. In fact, some had previously

signed the same agreement in years past and were familiar with at least some of the terms. Therefore, the Court finds it was not procedurally unconscionable because as the Magistrate Judge found, the evidence does not show Plaintiffs were pressured into signing the Agreements and they were not presented as a take-it-or-leave-it offer.

Plaintiffs primarily rely on the argument that they lacked sufficient fluency in English to understand what arbitration meant or that they were delegating to the arbitrator the authority to determine arbitrability. Plaintiffs point to their testimony at the hearing wherein each one recounted they were born in Romania, did not speak English growing up, and did not receive any English language instruction in high school or college. Each testified they speak Romanian in their daily lives, and that they spoke primarily Romanian while working at DGI.

Plaintiffs further testified that they speak and understand rudimentary English sufficient to perform their jobs but did not understand the concepts of arbitration and delegation. The arbitration clause was written in English but no one at DGI offered to translate it into Romanian despite DGI owners Alina and Daniel Sacu being native Romanian speakers.

Under the law any doubts on arbitrability are to be construed in favor of arbitration. "Both the Ohio General Assembly and Ohio courts have expressed a strong public policy favoring arbitration." *Alford v. Arbors at Gallipolis,* 2018-Ohio-4653, ¶ 11, 123 N.E.3d 305, 311 quoting *Hayes v. Oakridge Home,* 122 Ohio St.3d 63, 2009-Ohio-2054, 908 N.E.2d 408. "In light of the strong presumption favoring arbitration, all doubts should be resolved in its favor." *Alford,* 2018 Ohio at #14.[2] Moreover, credibility determinations by the Magistrate

---

[2] Although delegation clauses within arbitration clauses do not benefit from the same presumption in favor of arbitration. See *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 68-9 (2010).

Judge are entitled to deference by this Court. As stated previously by the Court, "credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his de novo review of the record he finds a reason to question the magistrate judge's assessment." *United States v. Johnson,* No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011). Finally, signing an agreement presumes the signer read and understood it. "Based on Ohio case law, simply signing the arbitration agreement assumes that the signer read and understood the arbitration agreement and the other party should be able to rely on that." *Dacres v. Setjo, L.L.C.,* 2019-Ohio-2914, ¶ 17, 140 N.E.3d 1041, 1046.

 Here, the Magistrate Judge had the opportunity to observe each Plaintiff under oath and concluded they had sufficient English competency to understand what they were signing and, even if they did not, they possessed the requisite knowledge and experience to discover the same, yet chose not to do so. There was ample evidence in the record upon which the Magistrate Judge based his finding. First, it is undisputed that the Lease Agreements and the arbitration clauses contained therein were written in plain English. The Lease Agreements themselves are only three to four pages long. There is no evidence that Defendants made any misrepresentations regarding the terms of the contract and there is no dispute that Plaintiffs all signed the Lease Agreements without taking the time to read them. Neither did any of the Plaintiffs ask for more time to review the Agreements, take them home to have an attorney to review, nor did they ask for translation into Romanian. Instead, each testified that they signed the lease Agreements because they trusted the Sacus due in part to their shared Romanian heritage. In fact, the testimony showed the Plaintiffs did indeed understand certain terms in the

Lease Agreements as they were able to understand the payment structure of the Lease Agreements. Also, at least one Plaintiff asked Alina about the payment structure prior to signing, thus demonstrating they could understand the Lease Agreement or, if they did not know, they could ask questions prior to signing.

All Plaintiffs testified they had a basic understanding of English. But the Magistrate Judge found that additional evidence demonstrated the Plaintiffs English proficiency exceeded their own representations. All four Plaintiffs formed their own limited liability companies to protect themselves from personal liability. They consulted friends and spouses in doing so, acknowledging that when they didn't understand some legal terminology they realized the need to consult with someone else. Yet, they did not do so with the Lease Agreements. Plaintiffs obtained mortgages, completed police reports, posted to Facebook and had cellphone agreements and other bills wherein if they did not understand a term, they consulted with spouses or friends. Perhaps most tellingly, each one took and passed the written examination in English to obtain their Commercial Driver's License, albeit in some cases after several attempts.

Daniel Tarog's former employer Juan Chadha testified that Tarog was a department leader at Cleveland Die Manufacturing Company and that Tarog worked for him for eight years prior to working for Defendant. Contrary to Tarog's testimony, Chadha testified that English was the common working language at Cleveland Die and Tarog was able to communicate effectively with those he supervised. Chadha did not speak Romanian but did not have issues communicating in English with Tarog.

Similarly, Alina Sacu testified she worked with Vlad at the Intercontinental Hotel prior to his employment with Defendant. In that capacity, Vlad was able to communicate in English

15

with both employees and guests of the hotel. She further testified that while employed at DGI Vlad needed to communicate with third-party brokers, shipping receivers and safety managers who did not speak Romanian.

Further evidence produced at the hearing demonstrated the Plaintiffs used the internet, including social media, Google Maps and Mail, Facebook and Youtube and Varvaruc used Google Translate. Thus, anyone of them could have accessed the AAA Commercial Rules of Arbitration and translated them. Thus, each had the reasonable opportunity to read and understand the arbitration clause and AAA Commercial Rules of Arbitration which contained the delegation clause, yet none did.

Ultimately, the Magistrate Judge found the Plaintiffs could read and understand the arbitration clause and had the opportunity to do so. "The crucial question is whether 'each party to the contract, considering his obvious education or lack of it, [had] a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print * * *?'" *Ohio Univ. Bd. of Trustees v. Smith,* 132 Ohio App. 3d 211, 220, 724 N.E.2d 1155, 1161 (1999) quoting *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 383, 613 N.E.2d 183, 189. In light of his findings, the Court agrees and adopts the Report and Recommendation.

The Magistrate Judge cited Ohio law and the overwhelming majority of federal circuits, including the Sixth Circuit, for the proposition that the inclusion of the AAA Rules of Arbitration in an arbitration clause clearly and unmistakably reveal an intent to delegate to the arbitrator questions of arbitrability. *Summit Constr. Co. v. L.L.F.J.A.O., L.L.C.,* 2012-Ohio-568, ¶ 17. ("This is evidence that the parties clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability[.]") See also *Cheney v. Sears, Roebuck and Co.*, 10th

Dist. No. 04AP–1354, 2005–Ohio–3283 ("The arbitrator, pursuant to the arbitration clause, has the authority to determine which of the claims are within the scope of the arbitration clause itself."); *Haddock v. Quinn,* 287 S.W.3d 158, 172 (Tex.App.2009). ("The majority of courts have concluded that express incorporation of rules empowering the arbitrator to determine arbitrability (including ruling upon his or her own jurisdiction) clearly and unmistakably evidences the parties' intent to delegate issues of arbitrability to the arbitrator.").

Finally, Plaintiffs allege that the Magistrate Judge exceeded his authority in finding Plaintiffs failed to show procedural unconscionability when he was solely tasked with determining the factual question whether the parties agreed to delegate issues of arbitrability to an arbitrator. The Court agrees with Defendant that finding whether the parties agreed to delegate questions of arbitrability necessarily involves factual findings and legal analysis.

Therefore, based on the findings of the Magistrate Judge that the parties clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator and that the Plaintiffs possessed sufficient proficiency in English to read and understand the arbitration and delegation clauses, or at least had the opportunity to do the same, the Court agrees with the Magistrate Judge's analysis and conclusion and holds that the arbitration and delegation clauses were not procedurally unconscionable. Having previously found the arbitration clause was not substantively unconscionable due to the costs of arbitration, the Court grants Defendant's Motion to Stay in order to allow the parties to arbitrate their dispute.

IT IS SO ORDERED.

Date: November 24, 2021  /s/Christopher A. Boyko
CHRISTOPHER A. BOYKO
Senior United States District Judge